The People of the State of New York, Plaintiff, *v.* Harry Cashin, Defendant.*

Court of General Sessions, New York County, April 26, 1932.

*John F. Joyce, Assistant District Attorney*, for the plaintiff.

*James D. C. Murray, A. Alfred Conrad* and *Irving A. Heinlich*, for the defendant.

Koenig, J.   The defendant was convicted of the crime of murder in the first degree on December 10, 1931, and was sentenced to death on December twenty-third of the same year.   He now moves for a new trial upon the ground of newly-discovered evidence.

The essential facts concerning the conviction are that on the 19th day of February, 1931, two men armed with guns entered a speakeasy at 49 Lexington avenue and held up the place.   While they were in the act of committing this robbery, Police Officers Pape and Scheuing entered the place.   They were dressed in plain clothes.   Officer Scheuing was killed by one of the robbers who in turn suffered death at the hands of Officer Pape.   The other robber escaped from the scene of the occurrence.   It was the claim of the People that this defendant was the other robber concerned in this killing.

Officer Pape, called as a witness in behalf of the People, was unable to identify this defendant, although he stated the defendant looked like the man.

·As evidence of the fact that this defendant was a perpetrator of the crime of robbery, the People mainly relied upon the testimony

* Revd., —— N. Y. ——,

of Gladys Clayton as to his identification. It is conceded that she was in the premises during the events that occurred therein.

It appears that while the robbery was in progress one June Clayton, whose true name is Emily Regan, entered the speakeasy. She was not a witness at the trial. Her affidavit is submitted in behalf of the defendant, and she gave testimony upon this motion for a new trial. For the purpose of this opinion she is referred to as June Clayton. This witness is not related to Gladys Clayton.

This motion was made, upon affidavits, to set aside the verdict upon the ground of newly-discovered evidence. The trial assistant for the People submitted his affidavit in opposition thereto. The court heard argument of that motion on January 12, 1932, and ordered that the affiants be produced before it for examination, the date of the hearing to be agreed upon by counsel, subject to the approval of the court. For various reasons, either due to the engagement of counsel or illness, the motion was not finally heard until March 31, 1932.

It must be borne in mind that this is a motion for a new trial on the ground of newly-discovered evidence and not a motion to set aside the verdict on the ground that it is contrary to the weight of the evidence. That motion was made before the pronouncement of judgment. The motion to set aside the verdict as against the weight of evidence has heretofore been denied.

The questions to be determined on this motion are, if the affidavits and testimony adduced in support of this motion constitute under the statute (1) newly-discovered evidence, or (2) if newly-discovered evidence, is it of such force and character that it would probably have changed the verdict of the jury had it been presented before them?

The statutory enactment which governs this motion is defined in section 465 of the Code of Criminal Procedure. So much of that section as is applicable to this case is to be found in subdivision 7, which provides that a new trial may be granted " Where it is made to appear, by affidavit, that upon another trial the defendant can produce evidence such as, if before received, would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence."

A motion for a new trial on the ground of newly-discovered evidence is strictly governed by the statute, and in the light of the decisions of the Court of Appeals construing that statute, this court cannot and should not go beyond those rules.

The affidavits and testimony on this motion may be segregated

into two divisions: (1) Matters tending to impeach or contradict the main witness for the People, Gladys Clayton, as to the truthfulness of her identification of this defendant as the perpetrator of the crime committed; and (2) matters tending to establish that the defendant was not the perpetrator of the crime.

The testimony of the affiants tending to impeach or contradict Gladys Clayton is no ground, under the decisions, even if successful, for a new trial. (*People* v. *Priori*, 164 N. Y. 459; *People* v. *Eng Hing*, 212 id. 373, 386.) In the latter case Judge WERNER said: " The whole proceeding, from beginning to end, was simply an effort to impeach the witnesses Florence Wong and Grace Mack; and that, as we have seen, is not a sufficient reason for granting a new trial on the ground of newly-discovered evidence, even where the impeachment is successful."

Because of the grave responsibility involved herein and the consequences to this defendant and to the People, I shall discuss briefly the evidentiary matter adduced. And for that purpose, I will assume that the affidavits and testimony might be regarded as newly-discovered evidence.

The affidavits and testimony which may come under the first classification, to wit, impeaching testimony, are those of Henry Moss, Robert Thompson, Charlotte A. Poillion, Catherine Poillion Smith, sister of Charlotte, Joseph Aronstein, and the affidavit of David S. Romanoff. The affidavit of Romanoff is considered on this motion as though he had submitted himself for examination.

The testimony of Catherine Poillion Smith may be joined with that of her sister, Charlotte A. Poillion, because their testimony is substantially to the same effect, to wit, that on or about the 18th day of July, 1931, she and her sister were confined in a cell in the Harlem Woman's Prison upon a charge of defrauding a hotel-keeper; that while there, the witness Gladys Clayton, upon whose testimony the People mainly relied in connection with other evidence to establish the guilt of this defendant, told them that she had identified a man who was concerned in a robbery during which a police officer was killed, although, in fact, she was unable to make an identification; that she identified the defendant because of police compulsion; that she believed, because she was a prostitute, it was to her advantage to do so; that when it was called to her attention that she might send an innocent man to the electric chair she said, " He was only to get 20 years, and it didn't matter."

These alleged declarations, evidencing a motive for her identification, were substantially denied by Gladys Clayton upon the trial of the defendant.

It does not appear that these witnesses ever acquainted the

authorities with these facts, although they professed that they were shocked by the prospective testimony of Gladys Clayton. It was only after the conviction of the defendant, when one of the newspapers in New York city became interested in the soundness of the conviction, that these facts came to life.

Both of these witnesses have been in conflict with the law, each having served three months in the penitentiary for fraud practiced upon a hotelkeeper.

After careful consideration of their stories, without unduly stressing their conviction, their testimony is regarded by me as unworthy of acceptance, for the following reasons, among others:

*First*, it seems highly improbable that Gladys Clayton would have told two utter strangers that she falsely identified this defendant as the criminal.

*Second*, Gladys Clayton, it appears, has never been convicted of a crime, nor does it appear that she was openly and avowedly a prostitute, although the evidence might fairly lead to the inference that she consorted with men. Therefore, the reason advanced for her false testimony is not persuasive.

*Third*, there seems to be no reason why the police should have caused her to identify the defendant Cashin as one of the perpetrators of a crime in which a police officer was killed, when the brother officer of the deceased policeman, who was in the speakeasy at the time of the killing, does not identify the defendant. Such conduct on the part of the police would neither have solved the murder nor served any useful purpose. Surely if police compulsion made the witness Gladys Clayton speak falsely, it is equally likely that the policeman who was at the scene of the crime would have spoken falsely if there had been a motive to speak falsely.

The court, therefore, declines to place any credence in the testimony of these witnesses.

The testimony of the witnesses Moss and Thompson, together with their affidavits, is substantially to the effect that in conversations with the witness Gladys Clayton immediately after the alleged killing, she stated that she was unable to identify any one connected with the killing. They also aver that she told them that she identified the defendant because of police compulsion. Gladys Clayton on her cross-examination upon the trial was interrogated as to whether she identified the defendant because of police pressure and threats to charge her with prostitution. This she denied.

The affidavit of Romanoff is to the same effect, with the additional statement that she was annoyed by the police with relation to her identification of the defendant.

Their testimony, if submitted to the jury, would have in no wise influenced their verdict for the reason that during her testimony given at the trial she frankly and unequivocally stated that on various occasions she had not identified the defendant as one of the perpetrators of the crime, until she confronted him in the district attorney's office. Then for the first time she identified him, and he was taken into custody. Upon his arraignment in the homicide court she did not identify him. Thereafter, before the grand jury and on the trial of the defendant, she testified that he was one of the participants in a robbery during which the deceased was killed. Her explanation for her failure to identify him on the other occasions was due to fear on her part. The testimony given on this motion concerning her alleged inconsistent declarations that she could not identify the defendant is in no way stranger than her own declarations under oath upon that point, and would not, in all probability, have affected the verdict rendered by the jury. As to the force of her alleged declarations as stated by some of the affiants that her identification of the defendant was due to police pressure, I have expressed my view in discussing the testimony of the Poillion sisters.

In this connection it may be stated that Officer Pape, on the hearing of this motion, testified that he neither directly nor indirectly influenced Gladys Clayton as to her identification of this defendant.

The affiant Aronstein's testimony seems of little weight on this motion. His testimony is to the effect that he had met Officer Pape some time after the killing of the deceased policeman and that Officer Pape had told him of his mission to seek the killer of his brother officer. He further states that Officer Pape said to him, " You look like the man," and he said, " It is a good thing you know me, or else you would arrest me." This undoubtedly was jocularly said by the officer.

Even though it may be accepted as a circumstance evidencing a description of the escaped robber different from the physical make-up of this defendant, it has no real probative value, since Officer Pape testified on the trial that he did not have sufficient opportunity properly to observe the second robber.

There remains to be considered the affidavit and testimony of June Clayton. It appears that during the progress of the trial her name was frequently mentioned as one who was present at the time of the killing, and her whereabouts was well known to the defendant's attorneys.

Upon this application for a new trial she states in substance that she was in the speakeasy at the time of the killing of the deceased police officer; that she had entered while the robbery was

in progress and was immediately forced into a corner and ordered to sit down by the deceased robber, who had a gun in his hand; that he threatened to shoot her but refrained from doing so at the suggestion of the bartender; that among others she saw Gladys Clayton, with whom she was well acquainted, in the place; that she did not get a good look at the face of the robber who is alleged to be this defendant; and that he appeared to be either of Jewish or Italian nationality " as much as she could see of the right side of his face."

In response to the direct question put to her, she said that the defendant was not one of the robbers. In that connection, it may be well inferred from her further testimony, if it is to be accepted as true, that it evidences she had no real opportunity to observe and identify the person alleged to be this defendant, and that she is in no position to identify any one. This testimony is as follows: " Q. Is it not a fact you did not get any kind of a look at him? A. As far as a description of his clothes, yes, I did. Q. When you say as far as a description of his clothes, you mean you did not get a look at his face sufficiently to identify him? A. No, sir, I did not. Q. Then you could not tell whether it was Cashin or not? A. Only in the height. Q. The only reason you say it is not Cashin is because the man you saw was taller? A. Was much taller, yes. Q. But you did not base your statement that Cashin was not the man on the fact that you were able to see the face of the man? A. Yes, sir."

She further states that she had a conversation with Gladys Clayton concerning her identification of Cashin; that Gladys stated to her that she was frightened into doing so; and that they would hold her in jail unless she said he was the man, but that she in fact could not identify the defendant as the person who was concerned in the robbery.

She was subpœnaed by the People as a witness, and for a few days during the trial sat outside the court room; she well knew the trial was in progress; she had every opportunity to know who were the attorneys for the defendant. It further appears that her presence at the trial was known to the defense.

The trial assistant for the People in his affidavit submitted on this motion states that while the trial was in progress he had talked with June Clayton and she stated to him that she could not identify any one as the perpetrator of the crime. She now denies she made that statement. The assistant further declared that in view of the fact that she had stated she had no knowledge of the perpetrator, he felt she would be of no value as a witness, and permitted her to leave.

After the conviction of the defendant, when stories respecting the soundness of the verdict appeared daily in a newspaper with a wide circulation, she got in touch with the brother of the defendant and was interviewed by a representative of this daily newspaper.

It further appears that she had written a letter while in the House of Detention to a male friend of hers, whom she asked to procure bail for her, in which she said, among other matters: "They are holding me and trying to make me say that I seen him on the night of February 19th, but I did not and said I did not. Gladys, the fool, told them all she knew because they put her in jail. * * * Please do not forget that you know me, as I am not going to say anything even if they kill me for not talking. Please do not say when you write that you received any mail from me when you write."

It is clear that the testimony of June Clayton does not fall within the statute defining newly-discovered evidence. The argument that she was in the custody of the police and was, therefore, not available to the defense is of no avail. A request to the court would have procured her attendance. It might well be inferred that the failure of the defense to call her as a witness was because they knew she was in no position to give favorable testimony for the defendant or as to the identity of the person who committed the crime involved under this indictment. (*People* v. *Farini*, 125 Misc. 300.)

Under the assumption that her testimony may be regarded as newly-discovered evidence, the court will consider that in contradiction to her testimony the trial assistant for the People has submitted the statement made by her the night of the homicide in which she said that upon her entrance into the speakeasy she was immediately forced into a corner by the deceased gunman, who attempted to shoot her but was prevented from doing so by the bartender; and that she was so frightened that she had no opportunity to observe either the deceased gunman or his accomplice. She gave substantially the same testimony before the grand jury.

From the testimony given upon the trial by the witnesses present in the speakeasy at the time of the occurrence, it might also be inferred that June Clayton neither had the opportunity nor the capacity to make an identification of the persons involved in the crime.

It is apparent that her testimony upon this motion is in conflict with her declarations made immediately after the event, and also in direct conflict with her testimony before the grand jury.

As throwing light on her credibility and the truthfulness of her

testimony, the court considers the affidavit of the affiant Moss submitted on behalf of the defendant. In it he states that June Clayton and Gladys Clayton came into the hotel where they were residing in the early morning after the killing of the deceased; that they were both perturbed and nervous; that they both stated they had witnessed the killing of a police officer in a speakeasy, and that Gladys Clayton stated she was unable to identify the person concerned in the killing. These recitals as to Gladys Clayton are contained in a separate paragraph. In another paragraph immediately thereunder he avers that he saw June Clayton later on that day; that she was more composed, and she stated to him that she had no opportunity, because of the circumstances of her entrance and her position, to observe the individuals concerned in the crime so as to enable her to identify them. In his testimony given upon the hearing he endeavors to explain away his declarations respecting June Clayton by stating that he had intended to refer to Gladys Clayton.

I am unable to accept this explanation. It is also apparent that he attempted in his affidavit to segregate the declarations of each of them. Unwittingly, he placed himself in the position that the declarations of June Clayton evidenced a lack of knowledge as to the identity of the offenders. Confronted with his affidavit, he attempted to explain the contents thereof. His explanation to me is unsatisfactory and futile.

Furthermore, I am not impressed with the story told by the affiant June Clayton. If she in fact knew that the defendant was not one of the persons concerned in the robbery, when immediately questioned thereafter, there was no reason which I can gather which would have prevented her from so stating, instead of asserting that she was unable to identify any one.

She knew that the trial was on; she had ample opportunity to get in touch with counsel for the defendant and acquaint them with her present story. The failure to do so indicates to me that her present testimony, taken in connection with all the circumstances, is in the main a concoction. If she was in no position to observe and make an identification, then her testimony is negative in value and would probably not have changed the verdict of the jury.

If the conclusion be reached in view of her letter to her friend that she was in a position to make an identification of the person who is alleged to be this defendant, I am of the opinion that the passages quoted from her letter to her friend indicate a refusal on her part to speak the truth. It might be well gathered from her letter, *first*, that Gladys Clayton spoke the truth, and, *second*, that

if June Clayton spoke the truth she would be forced to identify Cashin as a perpetrator in the crime, and to avoid speaking the truth and putting herself in a position of identifying this defendant she now gives this vague information of the escaped perpetrator, claimed by the People to be the defendant.

No evidence has been adduced to prove that Gladys Clayton was not present at the occurrence, nor that she was not in a position to see the persons and events described by her.

It is my judgment, after having observed June Clayton and having listened to her testimony, taken in conjunction with the facts brought out on the trial of this defendant, that her story would not have had such weight or force with the jury that it probably would have changed the verdict.

While this motion could properly have been disposed of on the ground that the affidavits and testimony submitted in support thereof do not constitute newly-discovered evidence under the statute governing this proceeding, in the interest of justice I have carefully considered the affidavits and the testimony, realizing the importance both to the People and to the defendant. I am of the opinion that the motion for a new trial should be denied.

The motion is denied.